<u>NOT FOR PUBLICATION</u>                                      (Doc. No. 17)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

————————————————————       :
                                                              :
ROBERT J. CONLON,                             :
                                                              :
                    Plaintiff,                            :
                                                              :
          v.                                                :         Civil No. 12-6693 (RBK/AMD)
                                                              :
RYDER SYSTEMS, INC., et al.,               :         **OPINION**
                                                              :
                    Defendants.                         :
————————————————————       :

**KUGLER**, United States District Judge:

      This matter comes before the Court on the motion of Defendants Ryder Systems, Inc.

("Ryder"),[1] William Oplinger ("Oplinger"), and Thomas Ferrante ("Ferrante") (collectively

"Defendants") for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Doc. No.

17).  The subject of this motion is Plaintiff Robert Conlon's ("Plaintiff") Complaint, in which he

alleged workers' compensation retaliation, malicious prosecution, and tortious interference with

prospective economic advantage claims against all Defendants.   For the reasons stated herein,

Defendants' motion will be granted as to all counts.

**I.        FACTUAL BACKGROUND[2]**

---

[1] It appears Plaintiff improperly pled "Ryder Truck Rental, Inc." as "Ryder Systems, Inc." in this matter.  (<u>See</u> Defs.' Br. at 1.)  However, the Court will hereinafter refer to Ryder Truck Rental, Inc. as "Ryder" for this opinion.

[2] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff.  <u>See</u> <u>Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.</u>, 998 F.2d 1224, 1230 (3d Cir. 1993).

Plaintiff commenced his employment with Ryder on April 19, 2010, as an at-will, non-exempt employee.  (Defs.' SMF ¶¶ 1-2.)[3]  Plaintiff worked as a diesel mechanic at Garelick Farms, Tuscan Dairies, one of Ryder's clients' facilities, located in Burlington, New Jersey.  (Id. ¶¶ 3, 5.)  The facility was open and operating 24 hours a day, other than from Saturdays at 2:00 p.m. until Sunday night at 11:00 p.m.  (Id. ¶ 7.)  In 2010, Ferrante was the tech-in-charge of the Burlington facility, and served as Plaintiffs' supervisor, though he was not a director or manager of Ryder.  (Id. ¶¶ 8-9.)  At all relevant times, Ferrante was acting at the direction and instruction of Ryder.  (Id. ¶ 106.)  At the same time, Oplinger was a Maintenance Manager with Ryder, and supervised nine facilities in the Philadelphia Business unit, including the facility located in Burlington County where Plaintiff worked.  (Id. ¶ 11.)  Oplinger supervised Ferrante, and at all relevant times, Oplinger was acting at the direction and instruction of Ryder.  (Id. ¶¶ 12, 107.)

On October 3 or 4, 2010, Plaintiff injured his back while opening one of the garage bay doors while working during his Sunday night to Monday morning shift.  (Id. ¶¶ 13-14.)  Plaintiff went to the hospital as a result of his back injury, and was released the same day.  (Id. ¶ 15.)  As a result of Plaintiff's injury at the facility, and in accordance with standard operating procedure,

---

[3] The Court references Defendants' Statement of Material Facts not in Dispute ("Defs.' SMF") for all facts that are not disputed by the parties.  See Hill v. Algor, 85 F. Supp. 29 391, 408 n.26 (D.N.J. 2000) ("[F]acts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.")  In multiple instances, Plaintiff attempts to argue that the affiant's or declarant's testimony relied on by Defendants is unreliable, without citing to record evidence supporting his position.  (See, e.g., Pl.'s Responding Statement of Material Facts ("Pl.'s Resp.") ¶ 34 ("Joseph Mwangi's declaration speaks for itself.  However, as will be seen in Plaintiff's Statement of Additional Material Facts, Mr. Mwangi's credibility is an issue for the jury.").)  However, Plaintiff's "failure to reference evidence of record demonstrates that there is no reason to disbelieve the statements of fact contained in the Paragraphs at Issue."  McCann v. Unum Provident, 921 F. Supp. 2d 353, 359 (D.N.J. 2013); see also Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 130 (3d Cir. 1998) ("a nonmoving party ... cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit to that effect.") (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)).  Likewise, Plaintiff's conclusory arguments and inferences are not proper assertions of fact, and are immaterial.  See Ridgewood Board of Educ. v. N.E., 172 F.3d 238, 252 (3d Cir. 1999) (holding that conclusory statements and arguments do not raise triable issues which preclude summary judgment).  Accordingly, where Plaintiff only relies on conclusory responsive statements, attacks the credibility of Defendants' affiants and declarants, or asserts denials unsupported by any evidence on the record, the Court will consider Defendants' facts undisputed.

a supervisor completed a report and Ryder performed an investigation into how the injury

occurred.  (<u>Id.</u> ¶ 17.)  Plaintiff was initially placed on light duty on October 5, 2010, due to his

injury.  (<u>Id.</u> ¶ 19.)  Plaintiff also made a claim for workers' compensation benefits after injuring

himself, and on October 19, 2010, he was placed on workers' compensation leave because his

treating physician determined that he was too injured to work.  (<u>Id.</u> ¶¶ 20-21.)  While he was

receiving workers' compensation benefits, Plaintiff was physically unable to work, and did not

look for work during that time.  (<u>Id.</u> ¶ 22.)

      Ryder is self-insured for its workers' compensation insurance and all claims are handled

by a separate, wholly owned subsidiary of Ryder, called Ryder Services Corp. ("RSC"), which

provides insurance and other administrative services to Ryder and its affiliated companies  (<u>Id.</u>

¶¶ 23-24.)  Plaintiff's workers' compensation claim was assigned to Joseph Mwangi

("Mwangi"), an RSC employee, and Linda Breads ("Breads"), another RSC employee who was

assigned to help with that claim.  (<u>Id.</u> ¶¶ 25-26.)  Breads had no authority to approve or deny

Plaintiff's workers' compensation claim, but was responsible for setting up appointments and

obtaining the reports and paperwork from doctors and medical facilities for Plaintiff's treatment.

(<u>Id.</u> ¶¶ 27, 31.)  For example, on October 25, 2010, in the course of performing her job duties,

Breads received a call from an MRI facility advising that Plaintiff failed to attend a scheduled

appointment.  (<u>Id.</u> ¶ 28.)  Breads then called Plaintiff to inquire about the supposed missed

appointment, and after speaking with Plaintiff was able to confirm with the MRI facility that

Plaintiff had to go to a different, open MRI facility, because he did not fit into the closed MRI

machine.  (<u>Id.</u> ¶ 29-30.)

      Mwangi, as the claims manager, determined whether or not to pay a workers'

compensation claim based on the facts and his investigation into a claim.  (<u>Id.</u> ¶ 31.)  Due to the

nature of Plaintiff's injury, and as part of RSC's standard operating procedure, Mwangi began an investigation into and collected information on Plaintiff's injury and possible other injuries he sustained for which he sought insurance benefits.  (Id. ¶ 33.)  As part of his investigation, Mwangi obtained an insurance index report, which contained persons with names similar to Plaintiff who submitted claims for injuries to insurance companies across the United States.  (Id. ¶ 34.)  Mwangi noticed on this report that there was a person that could have been Plaintiff, due to a similar name, and requested additional information related to that claim.  (Id. ¶ 35.)  He also called Plaintiff and asked if Plaintiff was involved in a prior automobile accident in Florida, to which Plaintiff refused to respond and instructed Mwangi to speak with his lawyer.  (Id. ¶¶ 36-37.)  As a result of Plaintiff's refusal to cooperate, Mwangi denied Plaintiff's workers' compensation claim.  (Id. ¶ 38.)  Plaintiff subsequently filed a petition with the Division of Workers' Compensation, seeking benefits, and an order was entered in his favor, allowing him to receive workers' compensation benefits.  (Id. ¶ 40.)  On September 10, 2012, it was determined that Plaintiff had reached maximum medical improvement, he was cleared to return to work with no restrictions, and his benefits ended.  (Id. ¶ 42.)  In the end, Plaintiff received the maximum workers' compensation benefits he was due for his injury, including disability payments, for the time he was unable to work from October 9, 2010 to September 10, 2012, all medical bills incurred as a result of the injury Plaintiff suffered at work have been paid, and Plaintiff continued to receive workers' compensation benefits after his termination with Ryder.  (Id. ¶¶ 41, 43, 83.)

On Saturday, October 23, 2010, Plaintiff, another Ryder employee named Chris Schnegelsberger ("Schnegelsberger"), and a non-Ryder employee named Scott Butler, went to the Burlington, New Jersey facility while it was closed, without notifying Plaintiff's supervisor,

4

Ferrante, or any other Ryder supervisor.  (Id. ¶¶ 44-46.)[4]  The Burlington facility is

approximately 50 miles from Plaintiff's home.  (Id. ¶ 45.)  While at the facility, Plaintiff took

documents known as payroll batch records and overtime logs from the Ryder office.  (Id. ¶¶ 47-

48.)  Payroll batch records were stored in a filing cabinet in the office after a batch had been

reviewed by the appropriate person and approved.  (Id. ¶ 49.)  The overtime logs were

maintained by Ryder to track overtime to be charged to the client, and the log identifies the work

performed and the amount of overtime likely to be charged to the client.  (Id. ¶ 50.)  The

overtime logs reflecting the current work week were kept in the shop near the computer, so

employees could write down the work performed and the time spent in excess of their scheduled

time.  (Id. ¶ 51.)  After each week had ended, the overtime log sheets were filed in the file

cabinet located in the office.  (Id. ¶ 52.)  The records contain employee information, such as

employee personal information and pay information, customer information, and information

about the work Ryder performed for a particular customer, which would be valuable to a

competitor.  (Id. ¶ 54.)

　　　　Ryder has a policy regarding the handling and use of its confidential business records,

which provides as follows:

> All Ryder records and information relating to Ryder or its
> customers are confidential, and you must treat them
> accordingly. …
>
> Confidential and proprietary information includes, but is not
> limited to Ryder's and its customers' intellectual property; trade
> and business secrets; … customer requirements; … employee
> data, … customer, vendor and supplier lists; computer-generated
> reports; … data used in the course of business; … costs; profits and
> loss statements and financial data; … pricing information, and
> other business information not available to the public. …

---

[4] Defendants refer to the non-Ryder employee as Scott Campbell, but according to Pl.'s Resp. at paragraphs 44 and
46, that individual's name was actually Scott Butler.  The discrepancy is not relevant for purposes of resolving this
matter, and for the remainder of this opinion, the Court will refer to him as Scott Butler.

> You may not remove any Ryder or Ryder-related information from
> Company premises (except in the ordinary course of performing
> duties on behalf of Ryder) without approval from an individual at
> director level or above.  Such information includes, without
> limitation: documents, notes, files, records, price lists, manuals,
> employee data, computer files or similar materials as listed above.

(Id. ¶ 56.)

Defendants argue that the documents copied and taken by Plaintiff related to payroll and work performed at the facility were considered "confidential."  (Ex. 1 to Pl.'s Opp'n, Robert Conlon Deposition Testimony ("Conlon Dep.") at 99:17-100:10; Ex. 2 to Pl.'s Opp'n, Thomas Ferrante Deposition Testimony ("Ferrante Dep.") at 36:12-37:8, 79:14-16; Ex. 3 to Pl.'s Opp'n, William Oplinger Deposition Testimony ("Oplinger Dep.") at 50:16-51:6, 51:13-25; Ex. 6 to Pl.'s Opp'n, Norman Kayler Deposition Testimony ("Kayler Dep.") at 82:13-24; Ex. H to Defs.' Br., October 25, 2010 Statement of Thomas Ferrante.)  Defendants also contend that Payroll batch records are not available to all employees and are only viewed by the manager or tech-in-charge of the facility.  (Oplinger Dep. at 50:23-51:25.)  Further, Defendants aver that Plaintiff had no actual authority or permission from a director at Ryder to use or remove the records for any use other than the ordinary course of business, and Plaintiff was not using the records he attempted to obtain in the course of Ryder's business.  (Conlon Dep. at 105:19-21.)

Plaintiff disputes that the records he admittedly took from the Ryder facility after hours were "confidential."  In support of his position, Plaintiff claims that he and other employees had routinely taken home overtime logs.  (Id. at 164:11-23.)  Plaintiff never asked Ferrante if he could make copies of and take home those records, and only asserts that Ferrante knew which documents Plaintiff was printing off and taking home with him.  (Id. at 105:19-21, 164:24-165:18.)  Referencing uncited language in the Ryder Employee Handbook, Plaintiff avers that

the records were as much his as they were Ryder's because he was "in charge of [his] time."  (Id. at 115:8-25 ("I'm in charge – in the handbook it says I'm in charge of my time.").)  On the date in question, Plaintiff claims he was going to pick up and review his time sheets, because he believed he was not being paid for overtime work.  (Id. at 75:7-19.)  According to Plaintiff, he had talked to Ferrante prior to the incident about the apparent lack of overtime pay.  (Id. at 76:2-13.)  Though he acknowledges that he had never gone to the facility after hours prior to the incident, (id. at 76:16-21), he claims he did not want to go during business hours because he had heard the other workers may have been making fun of him for getting hurt on the job.  (Id. at 77:13-19.)  Plaintiff also contends that Ferrante had told both him and Schnegelsberger that, if they wanted to come to the facility after hours, they had to do so with at least one other Ryder employee.  (Id. at 80:20-20; Ex. 7 to Pl.'s Opp'n, Certification of Christopher Schnegelsberger.)

Ferrante learned of Plaintiff's purported unauthorized access into the facility as a result of a call from Ryder's client, in which Ferrante was told there were employees at the facility while it was closed.  (Defs.' SMF ¶¶ 58-59.)  As a result of this phone call, Ferrante went to the facility, and when he arrived he encountered Schnegelsberger outside the shop.  (Id. ¶¶ 60-61.)  After a verbal exchange with Schnegelsberger, Ferrante instructed the security guard to call the police.  (Id. ¶ 62.)  Ferrante then encountered Plaintiff and Mr. Butler as they were leaving the facility.  (Id. ¶ 63.)  Plaintiff had a case in which he had placed the records he took from Ryder, and when Ferrante saw Plaintiff, he took the case from Plaintiff and examined inside it.  (Id. ¶¶ 64-65.)  In the case Ferrante found the Ryder business records (i.e., payroll batch records and overtime logs) Plaintiff had copied and taken from Ryder's office.  (Id. ¶ 66.)  Ferrante took the records from Plaintiff and then attempted to call Oplinger.  (Id. ¶¶ 67-68.)  Because he could not contact Oplinger, Ferrante contacted Mark Fried ("Fried"), the Director of Operations for the

region, and the next in the chain of command.  (<u>Id.</u> ¶ 69-70.)  Fried told Ferrante to request that the police take a report, and shortly thereafter the police arrived at the facility.  (<u>Id.</u> ¶ 70-71.) Upon speaking with all persons present, the Police instructed Schnegelsberger, Mr. Butler, and Plaintiff to leave the facility.  (<u>Id.</u> ¶ 71.)

On November 1, 2010, Plaintiff was terminated from his employment with Ryder for violating Ryder's Principles of Business conduct—namely, being at the facility in Burlington, New Jersey after hours, without authorization, and copying and taking Ryder's confidential business records.  (<u>Id.</u> ¶¶ 73-74.)  Fried, who was responsible for supervising 25 locations within the Philadelphia business unit, made the decision to terminate Plaintiff after conferring with the Human Resources Department ("H.R.") at Ryder.  (<u>Id.</u> ¶¶ 75, 77.)  Plaintiff acknowledges he was not terminated because he had filed a claim for workers' compensation.  (<u>Id.</u> ¶ 76.)  Though Fried had an average of five to six workers' compensation claims in his region each year, he had never terminated any employee because he or she made a claim for workers' compensation benefits.  (<u>Id.</u> ¶¶ 78-79.)  In fact, Fried had no involvement in the decision to grant or deny a claim for workers' compensation.  (<u>Id.</u> ¶ 80.)  Plaintiff learned of his termination in a letter, prepared by Human Resources representative Stacey Weidner, dated November 1, 2010, and signed by Oplinger, who was acting in his capacity as Maintenance Manager.  (<u>Id.</u> ¶¶ 81-82.)

Norman Kayler ("Kayler") was the Safety and Loss Prevention Manager for the area that included the facility in Burlington, New Jersey in 2010, and as the Safety and Loss Prevention Manager, he had responsibility for security issues and employee theft at the branches in his area. (<u>Id.</u> ¶ 84.)  Kayler instructed Oplinger to obtain a copy of the police report from the night of the incident, and when Oplinger had picked up that report he faxed it to Kayler.  (<u>Id.</u> ¶¶ 85-87.)

Once Kayler had reviewed the police report he forwarded it to the legal department.  (Id. ¶ 90.)

Ryder's policy on the theft of company property provides that:

> Ryder will investigate any suspected violation of [Ryder's
> Principles of Business Conduct] ... If appropriate, law enforcement
> authorities will be notified.  The Company supports criminal
> prosecution of those involved in any violation of these Principles
> that constitutes criminal conduct, regardless of restitution. … In
> addition, when appropriate, the Company will institute civil and/or
> criminal proceedings against violators of these Principles.

(Id. ¶ 90.)

Prior to making a decision to pursue criminal charges against Plaintiff, Ryder sought the

opinion of the Deputy General Counsel, Chief Privacy Officer, and Vice President of Global

Compliance and Business Standards, Marcia Narine ("Narine").  (Id. ¶ 91.)  Narine consulted

with Maria Ruiz ("Ruiz"), a trusted advisor and person familiar with legal investigations, and

had her investigate the matter prior to providing her opinion as to whether Ryder could initiate a

criminal complaint against Plaintiff consistent with Ryder's policies.  (Id. ¶¶ 92, 94.)  Ruiz was

Senior Director of Compliance at Ryder, and had worked with Narine for over eleven years at

that time.  (Id. ¶ 93.)  As part of her investigation, Ruiz spoke with Stacey Weidner (the H.R.

liaison for the region who gathered information on Plaintiff's employment history and H.R.'s

opinion of the events), Oplinger (the Maintenance Manager responsible for the facility), Ferrante

(Plaintiff's supervisor and the primary witness of the events), and Fried (the Director of

Operations for the region and person responsible for the decision to terminate Plaintiff).  (Id. ¶

95.)  Ruiz informed Narine about the details learned during her investigation, specifically that

Plaintiff had been at the facility when it was closed, had brought a non-Ryder employee with him

to the facility when it was closed, had taken Ryder's confidential business records without

permission, and was not at the facility or taking the records for work-related reasons.  (Id. ¶ 96.)

9

Based on Ruiz's report, Narine determined that a criminal complaint could be filed against Plaintiff. (Id. ¶ 97.) Thereafter, Ruiz advised Kayler that Ryder's Legal Department had determined that a criminal complaint could be filed, and to proceed as he deemed appropriate. (Id. ¶ 98.) Because Kayler was responsible for loss prevention issues, he was also responsible for deciding whether or not to file criminal charges, and carrying out that decision, after the Legal Department provided its opinion on the issue. (Id.)

Based on the facts surrounding Plaintiff's unauthorized presence at the facility and the taking of Ryder's confidential business documents, Kayler decided to press criminal charges against Plaintiff, having determined that it was consistent with Ryder's policy with respect to theft of company property. (Id. ¶ 99.) Kayler instructed Oplinger to file a criminal complaint against Plaintiff and Schnegelsberger, and on December 1, 2010, Oplinger filed a complaint with the Florence Township Police Department. (Id. ¶¶ 99-100.) On December 1, 2010, the municipal court found probable cause and issued warrants for the arrest of Plaintiff. (Id. ¶ 101.) Plaintiff was subsequently arrested, and criminal proceedings were initiated by the Burlington County Prosecutor. (Id. ¶ 102.) After reviewing the complaint, however, the prosecutor decided to downgrade the charges and return the complaints to Florence Township Municipal Court. (Id. ¶ 103.) The municipal prosecutor decided not to proceed with the charges against Plaintiff because Plaintiff told the prosecutor he was never told he could not go to the shop during non-business hours. (Id. ¶ 104.) To date, the arrest of Plaintiff due to the criminal complaint filed by Ryder has not caused him to be rejected from any employment opportunities. (Id. ¶ 105.)

On or about August 14, 2012, Plaintiff filed a civil Complaint in the Superior Court of New Jersey, Law Division, Atlantic County, and that Complaint was removed to this Court on October 23, 2012 (Doc. No. 1). In his Complaint, Plaintiff alleged that Defendants, and John

10

Doe Supervisors 1-20, terminated his employment with Ryder in retaliation for his filing a workers' compensation claim (Count I), maliciously prosecuted Plaintiff when they filed criminal charges against Plaintiff (Count II), and unlawfully interfered with Plaintiff's prospective economic advantage by filing criminal charges against Plaintiff (Count III). Defendants filed the present motion for summary judgment on May 23, 2014.  In his response, Plaintiff concedes that he cannot maintain a claim for tortious interference with prospective economic advantage against Ryder, so the Court will grant summary judgment in favor of Defendant Ryder as to Count III.[5]  For the reasons set forth more fully herein, the Court will grant summary judgment in favor of Defendants on Plaintiffs remaining claims.

## II.    LEGAL STANDARD

The Court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting First Nat'l Bank of Az. v. Cities Serv. Co., 391

---

[5] "Although '[u]se of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified,' these parties must be dismissed if such discovery does not reveal their proper identities." Cordial v. Atl. City, No. 11-1457, 2014 WL 1095584, at *3 (D.N.J. Mar. 19, 2014), recons. den., 2014 WL 2451137 (D.N.J. June 2, 2014) (citing Blakeslee v. Clinton Cnty., 336 F. App'x 248, 250 (3d Cir. 2009) (affirming district court's sua sponte dismissal of fictitious parties that were not identified after discovery)).  "This may be done upon motion of a party or the Court." Id. (citing Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.")).  Here, Plaintiff has failed to amend his Complaint or otherwise identify any of these fictitious defendants despite the fact that discovery has now closed.  Thus, these parties shall be dismissed.

U.S. 253, 289 (1968)).  In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact.  Anderson, 477 U.S. at 248.  Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in its favor.  Id. at 255; Matsushita, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment.  Anderson, 477 U.S. at 256.  The nonmoving party must at least present probative evidence from which the jury might return a verdict in his favor.  Id. at 257.  The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III.   DISCUSSION

### A.   Workers' Compensation Retaliation

Defendants argue that Plaintiff cannot prove a prima facie case of worker's compensation retaliation, and even if he could make such a showing, he cannot prove that Defendants' reason for firing him was pretextual.  (Defs.' Br. at 5-13.)  Plaintiff claims there is a disputed issue of fact as to whether his termination occurred for legitimate reasons, and whether he was actually fired for filing a workers' compensation claim.  (Pl.'s Opp'n at 3-5.)  Because Plaintiff has not put forth any disputed facts which even suggest that he was fired for retaliatory reasons related to his workers' compensation claim, his claim fails as a matter of law.

Plaintiff's claim is governed by the New Jersey Workers' Compensation Act.  See N.J. Stat. Ann. § 34:15-39.1 ("It shall be unlawful for any employer or his duly authorized agent to

discharge or in any other manner discriminate against an employee as to his employment because such employee has claimed or attempted to claim workmen's compensation benefits from such employer…").  In order to establish a prima facie case for retaliatory discharge, Plaintiff must prove that (1) he made or attempted to make a workers' compensation claim, and (2) that he was discharged or discriminated against in retaliation for making the claim.  See Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 442 (App. Div. 1988); Lally v. Copygraphics, 173 N.J. Super. 162, 176-77 (App. Div. 1980).  In analyzing such a claim, the Court looks for a causal nexus between the workers' compensation claim and the employee's discharge.  Carter v. AFG Indus. Inc., 344 N.J. Super. 549, 557 (App. Div. 2001).

While it is undisputed that Plaintiff filed a claim for workers' compensation, he has not put forth one shred of evidence supporting his allegation that his termination from Ryder was predicated on his pending workers' compensation claim.  See Galante v. Sandoz, Inc., 192 N.J. Super. 403, 407-08 (Law Div. 1983) ("The record reflects that the employee did file a claim for compensation after the accident, but the employee failed to offer even a scintilla of proof that his termination predicated upon the application of the absence control policy was a retaliatory move on the part of his supervisors.")  First, Plaintiff does not cite any evidence to dispute that the reason for his termination had nothing to do with his workers' compensation claim.  (See Defs.' SMF ¶ 76; Pl.'s Resp. ¶ 76 (attacking only the credibility of Fried's deposition testimony, but pointing to no evidence on the record to support his position).)  Plaintiff acknowledges that Mwangi and Breads, the RSC personnel responsible for investigating and processing Plaintiffs' workers' compensation claim, worked for RSC and not Ryder, and they were in no way involved in the decision to terminate his employment.  Further, Plaintiff does not disagree that the decision to terminate him came after the investigation into the incident at the Burlington, New

13

Jersey facility on October 23, 2010.  The undisputed record shows that Fried, the Ryder employee responsible for making the decision to fire Plaintiff, had dealt with five to six workers' compensation claims in his region each year, yet had never fired anyone for filing such a claim. In fact, Fried had no control or involvement with the processing or approval of Plaintiff's workers' compensation claim. See Mallon v. Prudential Property & Cas. Ins. Co., 688 F. Supp. 997, 1011 (D.N.J. 1988) (noting "[the defendant] does not handle its own workers' compensation claims; they are handled by The Travelers Insurance Company, defendants' workers' compensation carrier" as evidence that the defendant was not retaliating for plaintiff's having filed a workers' compensation claim).  In light of these uncontested details, there is no genuine issue of material fact concerning whether Plaintiff was discharged for filing a workers' compensation claim.  See Galante, 192 N.J. Super. at 408 ("Here, even the employee acknowledged that he was not fired because he sought benefits from workers' compensation. He apparently believed, as does the court, that his termination was a result of excessive absenteeism."); see also Mallon, 688 F. Supp. at 1011 ("Without any specific evidence showing plaintiff's discharge was in retaliation for his having filed for workers' compensation benefits, defendant's motion for summary judgment must be granted.")

Plaintiff's only arguments seem to come from his allegations regarding the difficulty he initially encountered receiving the full benefits of his workers' compensation claim, and the circumstances that led to his discharge.  (See Pl.'s Opp'n at 4.)  The Court notes that Plaintiff has not alleged Defendants actually attempted to obstruct his access to his workers' compensation benefits, only that they undertook an investigation into his claim and injuries, and he admits that they in fact eventually paid those benefits in full.  As noted above, Plaintiff does not allege that the persons responsible for investigating his workers' compensation claim had any contact with

or connection to the individuals responsible for investigating the incident of October 23, or vice versa.  Additionally, while Plaintiff argues that Ryder should not have fired him over the incident of October 23, 2010, as is discussed infra, it was consistent with Ryder's undisputed business policies to terminate Plaintiff once he had been caught stealing confidential business records.  However, even if Plaintiff was correct in alleging that Ryder did not actually have the right to fire him after the incident at the Burlington facility, he still has not established that the reason for his termination was discriminatory.  See Silvestre v. Bell Atlantic Corp., 973 F. Supp. 475, 483 (D.N.J. 1997) ("To discredit the employer's proffered reason, plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.") (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)).

Based on the foregoing, Plaintiff has failed to establish a prima facie case of retaliation for his having filed a workers' compensation claim.  The Court will grant summary judgment in favor of Defendants as to Count I of the Complaint.

### B.      Malicious Prosecution

Defendants contend that Plaintiff's claim for malicious prosecution fails as a matter of law.  They assert that Plaintiff has failed to show a lack of probable cause, Plaintiff has failed to show any form of malice, and Defendants acted on the advice of counsel when determining whether to institute criminal charges.  (Defs.' Br. at 14-19.)  Plaintiff counters by claiming there are facts in dispute concerning whether it was reasonable to file claims for theft and burglary in light of the alleged unwritten policies regarding entering the Ryder facilities after hours and taking home copies of overtime logs, and concerning whether Defendants harbored malice when they filed the complaint.  (Pl.'s Opp'n at 9-11.)  He further argues that Defendants cannot rely on

the advice of counsel defense because Narine did not have all of the relevant facts before her when she advised that criminal charges could be brought against Plaintiff.  (Id. at 11-12.) Despite his protestations, Plaintiff has not raised an issue of material fact with respect to the issue of probable cause, and the Court will grant summary judgment as to that claim.

"The elements of the cause of action for malicious prosecution are well-defined: 'plaintiff must prove (1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff.'"  Brunson v. Affinity Federal Credit Union, 199 N.J. 381, 393-94 (2009) (quoting Helmy v. City of Jersey City, 178 N.J. 183, 190 (2003)).  "The essence of the cause of action is lack of probable cause, and the burden of proof rests on the plaintiff.  The plaintiff must establish a negative, namely, that probable cause did not exist."  Lind v. Schmid, 67 N.J. 255, 262-63 (1975); see also LoBiondo v. Schwartz, 199 N.J. 62, 93 (2009) ("Probable cause is a matter of law to be determined by the court, and it is only submitted to the jury if the facts giving rise to probable cause are themselves in dispute.")  This requires Plaintiff to show that "the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed."  Id. at 263. Probable cause is not considered in hindsight, but instead "at the time when the defendant put the proceedings in motion."  Brunson, 199 N.J. at 398 (internal quotation omitted); see also LoBiondo, 199 N.J. at 93 ("The question to be decided is whether, in the prior suit, the facts supported the actor's 'honest belief' in the allegations.")

Here it is undisputed that Ryder had a policy which considered all employee data and other business records confidential information, and prohibited the removal of such records by employees unless it was in the ordinary course of performing duties on behalf of Ryder, or with

approval from a Ryder employee at director level or above.  (Defs.' SMF ¶ 56.)  In the event that a Ryder employee violated the company policies by unlawfully taking confidential information, the company also had a policy of, when appropriate, instituting criminal proceedings against the violator.  (Id. ¶ 90.)  It is also undisputed that Plaintiff was at the Burlington facility after hours on October 23, 2010, with a non-Ryder employee.  While there, he attempted to take not only overtime logs, but also payroll batch records, which Plaintiff has not alleged were records he routinely took in the past.  The investigation of the incident, undertaken by Ruiz at Narine's direction, revealed these facts—that Plaintiff had been at the facility after hours, with a non-Ryder employee, and had attempted to take what Ryder considered to be confidential business records.  Based on the report, Narine advised Kayler that criminal charges could be brought, and Kayler decided to file a criminal complaint based on the apparent theft of company property.  Based on these undisputed circumstances, a reasonably prudent person in Kayler's position (the Ryder employee responsible for making the decision whether to institute a complaint against Plaintiff) could believe that Plaintiff had committed burglary, theft, and conspiracy on October 23, 2010.[6]

Plaintiff's arguments to the contrary are not persuasive.  While Plaintiff alleges, and the court must accept as true, that he witnessed other employees take overtime logs in the past, and that Ferrante may have allowed employees at the Burlington facility to come in after hours so long as they were accompanied by another employee,  he has not attempted to explain why Ruiz

---

[6] See N.J. Stat. Ann. 2C:18-2(a). ("Burglary defined. A person is guilty of burglary if, with purpose to commit an offense therein or thereon he:  (1) Enters a … structure … unless the structure was at the time open to the public or the actor is licensed or privileged to enter."); N.J. Stat. Ann. 2C:20-3(a) ("Movable Property. A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof."); N.J. Stat. Ann. 2C:5-2 ("Definition of conspiracy. A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:  (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.")

in conducting her investigation, Narine in formulating her legal opinion, and Kayler in making

the final decision to file a complaint, were unreasonable in their conclusions, in light of nature of

Plaintiff's after-hours trip to the facility, the fact that he brought a non-Ryder employee with

him, the official company policies regarding the taking of Ryder business records, and the extent

of the company records he attempted to take with him.  He has not offered any evidence tending

to explain why his taking of payroll batch records would not be considered theft of confidential

company records.  Nor has Plaintiff shown or pointed to evidence suggesting that Ruiz, Narine,

or Kayler were aware of the purported unofficial policies of allowing Ryder employees to enter

the Burlington facility after hours and allowing Ryder employees to make copies of and take

home overtime logs for their own records.  He has also failed to allege that he was permitted to

enter the Burlington facility after hours with a non-Ryder employee.  Instead, the record before

the Court suggests that, through the determinations of three different Ryder employees, and

based on the information those employees had at the time the decision was made, charges

reasonably could be filed against Plaintiff for what appeared to constitute a violation of Ryder

company policy, and looked to be burglary, theft and conspiracy on behalf of Plaintiff.  See

Brunson, 199 N.J. at 398 ("Was the state of facts such as to lead a person of ordinary prudence to

believe on reasonable grounds the truth of the charge at the time it was made?") (emphasis in

original) (quoting Lind, 67 N.J. at 263).  Plaintiff has made no showing to suggest that Ryder's

decision was unreasonable at the time, and hindsight cannot save his claim.

      Because the Court finds that Plaintiff has failed to make a showing to support the absence

of probable cause, it will grant summary judgment in favor of Defendants on Plaintiff's

malicious prosecution claim.

C.      **Tortious Interference with Prospective Economic Advantage**

As noted above, Plaintiff claim for tortious interference remains only as to Defendants Oplinger and Ferrante.  Defendants argue that summary judgment should be granted because Oplinger and Ferrante were, at all relevant times, acting within the scope of their employment. (Defs.' Br. at 20-22.)  Plaintiff does not address Defendants' contention, and only argues that all of the prima facie elements of his claim against Oplinger and Ferrante have been established. (Pl.'s Br. at 14-15.)  Because the record shows Oplinger and Ferrante were acting in the course of their employment with respect to Plaintiff's termination, summary judgment will be granted in favor of Defendants.

To state a claim for tortious interference with prospective economic advantage, New Jersey law requires a party to establish: "(1) a reasonable expectation of economic advantage from a prospective contractual or economic relationship; (2) the defendant intentionally and maliciously interfered with the relationship; (3) the interference caused the loss of the expected advantage; and (4) actual damages resulted." Am. Leistritz Extruder Corp. v. Polymer Concentrates, Inc., 363 Fed. App'x. 963, 967 (3d Cir. 2010) (citing Varrallo v. Hammond Inc., 94 F.3d 842, 848 (3d Cir. 1996)).  However, "it is a 'fundamental' element of a claim for intentional interference with prospective economic advantage that the claim be directed against defendants who are not parties to the underlying contractual or economic relationship." Marrero v. Camden Cnty. Bd. of Soc. Services, 164 F. Supp. 2d 455, 478 (D.N.J. 2001) (citing Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739 (1989)).  As both parties acknowledged, Plaintiff was an employee of Ryder, and accordingly his claim against Ryder is barred.  Additionally, however, an employee of an otherwise immune employer is himself immune unless a plaintiff asserts that the employee "was acting 'outside the scope of his

19

employment and/or for his own personal gain.'" Marrero, 164 F. Supp. 2d at 478 (quoting

Horvath v. Rimtec Corp., 102 F. Supp. 2d 219, 236 (D.N.J. 2000)); see also Varrallo, 94 F.3d at

849 n.11 ("An employee who acts for personal motives, out of malice, beyond his authority, or

otherwise not 'in good faith in the corporate interest' falls outside the scope of the privilege.")

   Here, Plaintiff has not made any showing to dispute Defendants' argument that Ferrante

and Oplinger were acting within the scope of their employment when Plaintiff was fired, and

instead he acknowledged that very fact.  (See Defs.' SMF ¶¶ 106-07; Pl.'s Resp. ¶¶ 106-07.)

Plaintiff has not provided any evidence to suggest that Oplinger or Ferrante were acting outside

the scope of their roles at Ryder and/or for their own personal gain.  See Marrero, 164 F. Supp.

468, 478 (D.N.J. 1996).  Instead, the record indicates that at all relevant times, Oplinger and

Ferrante were acting within the scope of their employment, and neither of them had any

involvement in making the decision to terminate Plaintiff.  The only acts undertaken by Oplinger

and Ferrante, including Ferrante obtaining the police report and Oplinger signing the notice of

termination, were done at the behest of Fried, Ryder's Director of Operations for the region, who

was a supervisor over both Oplinger and Ferrante.

   Because Ferrante and Oplinger were operating within the scope of employment at all

times relevant to this case, Plaintiff's tortious interference claims against them are barred, and

summary judgment will be granted in favor of Defendants.

## IV. CONCLUSION

   For the reasons expressed above, Defendants' motion for summary judgment will be

**GRANTED**.  An appropriate Order shall enter.


Dated:  11/12/2014           s/ Robert B. Kugler
                 ROBERT B. KUGLER
                 United States District Judge